UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

ALEXANDER BERNARD KASPAR

Debtor.

-------------------------------------------------------

TOWN OF PUTNAM VALLEY,

Appellant,

v.

ALEXANDER BERNARD KASPAR,

Appellee.

No. 20-CV-393 (KMK)

OPINION

Appearances:

Lewis D. Wrobel, Esq.
Anthony C. Carlini , Jr., Esq.
Handel & Carlini, LLP
Poughkeepsie, NY
*Counsel for Appellant*

Matthew M. Cabrera, Esq.
M. Cabrera & Associates, PC
Goshen, NY
*Counsel for Appellee*

KENNETH M. KARAS, District Judge:

The Town of Putnam Valley ("Appellant" or the "Town") appeals from the December 16,

2019 Order of the Bankruptcy Court for the Southern District of New York (the "Bankruptcy

Court"), which removed a state court-appointed receiver and reinstated the automatic stay

pursuant to 11 U.S.C. § 362(a). (*See* Am. Not. of Appeal 1 (Dkt. No. 5).)  Alexander Bernard

Kaspar ("Appellee" or "Kaspar") has moved to dismiss the appeal for lack of jurisdiction and

lack of standing.  (*See generally* Appellee's Mot. To Dismiss Appeal ("Appellee's Mot.") (Dkt.

No. 12).)  For the reasons that follow, Appellee's Motion is denied.

## I.  Background

### A.  Factual Background

The following facts are drawn from the Parties' submissions on appeal, including the

certified record.

#### 1.  The Town's Enforcement Action Against Kaspar

The instant Motion is the latest volley in a bitter, enduring dispute between Kaspar and

the Town.  The origins of this dispute can be traced to sometime in 2005, when Kaspar and his

wife, Grace DeLibero ("DeLibero"), allegedly began to operate an "illegal land fill" on a portion

of their property in the Town of Putnam Valley.  (*See* Appellee's Mot. Ex. C (Aff'n of Robert C.

Lusardi, Esq., in Supp. of Mot. for Relief from Automatic Stay ("Lusardi Aff'n")) ¶ 3 (Dkt. No.

12-3).)  According to the Town, Kaspar conducted a range of illegal activities on his property,

including:

> logging the property, cutting trees in the wetlands and wetland buffers, using heavy
> track machinery in the wetlands, conducting a 'dumping operation' on the property,
> removing stonewalls for sale, processing and disposal of wastes, materials,
> processing and sales, landfilling, land clearing, site development and excavation
> and related commercial industrial activities all without permits required by the
> [Town] Code.

(Reply Aff'n of Robert C. Lusardi, Esq., in Further Supp. of Mot. for Relief from Automatic

Stay ("Lusardi Reply Aff'n") ¶ 4 (Bankr. Dkt. No. 45)); *see also* Lusardi Aff'n ¶ 3 (stating that

"[i]tems of household refuse, tree stumps, construction demolition debris, and other substances

were brought on to the property by carters, landscaping companies, and others" over a multiyear

period).)[1]  Subsequent inspections by local enforcement officers, state environmental officials, and even two state court judges would confirm the considerable scope of damage to the property. (*See* Mot. for Relief from Automatic Stay Ex. I ("Grossman Op."), at 4 (Bankr. Dkt. No. 26-10) (noting a Town enforcement officer's 2007 description of a "dumping operation that measured 'almost 300 feet long and 10-15 feet high' and 'included stumps, branches, woody material, construction and demolition debris and household garbage'"); *id.* at 6 (noting that by 2013, testing performed by the New York State Department of Environmental Conservation (the "NYSDEC") had "revealed the presence of known carcinogens linked to various types of cancer, cardiovascular disease[,] and developmental impacts on one of the [tax] parcels"); Lusardi Reply Aff'n ¶ 18 (noting that after visiting the site himself, State Court Justice Francis A. Nicolai wrote in a February 21, 2012 Decision and Order that "[t]he visible debris included various materials, including plastics, porcelain, and tree stumps and raised issues of waste disposal beyond those related to timber and forestry"); *id.* ¶ 23 (noting that in a 2011 report, a state court-appointed receiver described "debris [that] was buried 20 feet deep," including "plastic bags, nitrile gloves, steel angle iron, steel pipe, plastic pipe, asphalt, lumber, ash[-]like material, buried [and] unprocessed [construction and debris] fill, concrete[,] and so forth").)[2]

---

[1] References to the Bankruptcy Docket refer to Bankruptcy Petition No. 18-36862 in the U.S. Bankruptcy Court for the Southern District of New York (Poughkeepsie).

[2] The "Grossman Opinion," attached as Exhibit I to the Town's Motion for Relief from the Automatic Stay filed in the Bankruptcy Court, is a 2018 opinion by the Honorable Victor G. Grossman, Justice of the Supreme Court, Putnam County ("Justice Grossman"), that helpfully recounts the long and tortuous history of the underlying litigation between Kaspar and the Town. *See Town of Putnam Valley v. Thomas*, Index No. 627/2006 (Sup. Ct. Putnam Cty. Sept. 27, 2018).

After Kaspar failed to comply with the Town's violation notices, the Town brought suit on May 22, 2006, seeking to enjoin Kaspar from further despoiling the property.  (Lusardi Reply Aff'n ¶ 5; Grossman Op. 4.)  On March 5, 2007, the late Honorable Andrew P. O'Rourke, then a Supreme Court Justice in Putnam County, granted the Town's preliminary injunction, which was subsequently affirmed by the Appellate Division, Second Department (the "Second Department"), on April 18, 2008.  (Lusardi Aff'n ¶ 4; Grossman Op. 5.)  While his appeal to the Second Department was pending, however, Kaspar continued operating his private landfill.  (Lusardi Aff'n ¶ 5; Lusardi Reply Aff'n ¶ 8; Grossman Op. 5.)[3]  Indeed, Kaspar apparently carried on, undeterred, even after the Second Department upheld the injunction in April 2008, and after the Town initiated contempt proceedings on May 5, 2008.  (Lusardi Aff'n ¶ 6; Lusardi Reply Aff'n ¶¶ 9–10; Grossman Op. 5.)  Finally, after a hearing on the Town's application for contempt, Kaspar entered into a settlement agreement that was reduced to an Order and Judgment (the "Consent Order") signed by Justice O'Rourke on March 12, 2009.  (Lusardi Aff'n ¶ 6; Lusardi Reply Aff'n ¶ 11; Grossman Op. 5.)  Among other provisions, the Consent Order (i) stated that Kaspar's activities violated municipal law, (ii) ordered that various heavy machinery and equipment be removed from the property, (iii) required Kaspar and his wife to submit a restoration plan, and (iv) directed that the property "be restored and remediated in accordance with regulations of the [NYSDEC]."  (Grossman Op. 5; *see also* Lusardi Aff'n ¶ 6 (noting that, pursuant to the terms of the Consent Order, Kaspar "agreed to cleanup [sic] the illegal landfill in accordance with a remediation plan approved by the [c]ourt"); Lusardi Reply Aff'n ¶ 13 (noting that the Consent Order directed Kaspar to "cease and desist all activities on the property").)

---

[3] Kaspar had successfully stayed the injunction pending his appeal to the Second Department.  (Lusardi Reply Aff'n ¶ 8.)

But the saga was just beginning.  Despite having consented to Justice O'Rourke's Consent Order in March 2009, Kaspar then objected to the court's remediation directive in a letter dated May 19, 2009, arguing that he was in compliance with state environmental regulations after all.  (*See* Lusardi Reply Aff'n ¶ 14; Grossman Op. 5.)  Although the NYSDEC had notified Kaspar of "[n]umerous violations" on March 6, 2009—just six days before Justice O'Rourke signed the Consent Order—Kaspar's May 19 letter stated, incredibly, that "[t]he site was regularly monitored by [the NYSDEC] and . . . was [found to be] in compliance with [NYSDEC] regulations."  (Lusardi Reply Aff'n ¶¶ 14–15; Grossman Op. 5–6.)  There is no evidence, however, that Kaspar took any steps to remediate the property between entry of the Consent Order and his May 19 letter to Justice O'Rourke.  (Lusardi Aff'n ¶ 7 (averring that Kaspar had "still refused to [clean up] the property" following the Consent Order); Lusardi Reply Aff'n ¶ 14 (noting that although "no [r]eceiver was in charge of the property" immediately after entry of the Consent Order, and Kaspar was therefore "free to [clean up] the property on his own accord," he "did no such thing"); Grossman Op. 5–6 ("[D]espite the determinations of the Supreme Court, and the Appellate Division, the [NYSDEC], and Town officials, Kaspar not only denied what was found, but [] also failed to remediate the contamination in spite of his consent to do so.").)

In August 2009, after Kaspar had still taken no steps to remediate the property, the Town pursued yet another remedy in state court, moving for the appointment of a post-judgment receiver who could enforce the Consent Order.  (Lusardi Reply Aff'n ¶ 16; Grossman Op. 6.) Kaspar sought to vacate the Consent Order by cross-motion.  (Lusardi Reply Aff'n ¶ 16; Grossman Op. 6.)  On November 12, 2009, after having inspected the property himself, Justice O'Rourke granted the Town's motion to appoint a receiver, denied Kaspar's cross-motion, and

further directed that the property be remediated in accordance with a restoration plan (the "Donohue Plan") prepared by landscape architect Bruce M. Donohue ("Donohue"). (Lusardi Aff'n ¶ 8; Lusardi Reply Aff'n ¶ 16; Grossman Op. 6.) On March 15, 2011, the Second Department affirmed. (Lusardi Aff'n ¶ 9; Grossman Op. 6 (citing *Town of Putnam Valley v. Cabot*, 82 A.D.3d 959 (2d Dep't 2011)).)

Still, Kaspar was not ready to throw in the towel. In February 2011, shortly before the Second Department affirmed Justice O'Rourke's November 2009 Decision and Order, he brought an application to discharge the receiver. (Lusardi Reply Aff'n ¶ 17; Grossman Op. 6.) After visiting the site himself, the Honorable Francis A. Nicolai, then Supreme Court Justice for Westchester County, observed that there was still "visible debris" on Kaspar's property, including "plastics, porcelain, and tree stumps," which implicated "issues of waste disposal beyond those related to timber and forestry." (Grossman Op. 6; Lusardi Reply Aff'n ¶ 18.) On February 21, 2012, Justice Nicolai ordered that Donohue serve as the court-appointed receiver (the "Receiver"), "based on his experience with solid waste management and landscape architecture." (Grossman Op. 6.)[4] Ten months later, on December 21, 2012, Justice Nicolai authorized the Receiver to sell portions of the property in order to generate funds for remediation. (Lusardi Aff'n ¶ 11; Lusardi Reply Aff'n ¶ 21.)

Perhaps unsurprisingly, the Receiver's efforts to sell the property encountered several roadblocks. One challenge stemmed from "environmental constraints" endemic to the property,

---

[4] Kaspar's counsel has stated that although Justice O'Rourke granted the Town's motion to appoint a receiver in 2009, no receiver was actually appointed until 2012. (*See* Appellant's Aff. in Opp'n to Appellee's Mot. To Dismiss ("Appellant's Aff.") Ex. E ("Lift-Stay Hearing Tr."), at 9:14–23 (Dkt. Nos. 18, 18-5) (observing that although "[a]n order was put into place for a receiver in 2009[,]" the Town "didn't even put a receiver in place for three more years"); *id.* at 10:8 ("Three years go by, no receiver.").)

including "wetlands, steep slopes, and limited access from public roads." (Lusardi Aff'n ¶ 12; *see also* Lusardi Reply Aff'n ¶ 30 (describing environmental limitations in detail).) Another challenge involved land-use restrictions: with the exception of one tax parcel, the property is located in a zoning district that limits use of the property to residential and non-commercial purposes. (Lusardi Reply Aff'n ¶ 30.) Arguably the greatest challenge, however, was a collection of mortgages on the property held by J.P. Morgan Chase Bank ("Chase") "in an amount exceeding two million dollars." (Lusardi Aff'n ¶ 12; *see also* Grossman Op. 7–8.) Nevertheless, following several years of negotiations, Chase issued Satisfactions of Mortgage in 2017 that "freed up considerable equity in the property and revived" efforts to sell the property. (Lusardi Aff'n ¶ 13.)[5]

Recognizing the unique challenges posed by the property, the Receiver concluded that the most viable strategy was to sell the property to a land trust—an approach that (in theory, at least) "would avoid delay, financing contingencies, and development contingencies." (Lusardi Aff'n ¶ 14.) Accordingly, after the Hudson Highlands Land Trust (the "Land Trust") submitted an offer to purchase a portion of the property, the Receiver sought court approval of the sale on May 30, 2018. (Lusardi Aff'n ¶¶ 14–15.)[6] Under the terms of the proposed sale, the Land Trust

---

[5] Kaspar's counsel has vigorously disputed the Town's characterization of how these mortgages were ultimately discharged. (*See* Lift-Stay Hearing Tr. 11:11–17 (arguing that although "certain statements" by opposing counsel suggest "that they were supposedly instrumental in getting these mortgages removed from the property, . . . [i]t was Mr. Kaspar that appeared in his foreclosures and it was Mr. Kaspar that directed Chase Bank to dissolve and satisfy the mortgage"); *cf.* Lusardi Aff'n ¶ 13 ("The Receiver, after making extensive efforts over the course of several years to negotiate a partial release of the mortgage liens from Chase Bank, finally succeeded in April 2017 . . . .").)

[6] According to its website, of which the Court takes judicial notice, the Land Trust "is a community-based, nonprofit land conservation organization that protects and preserves the natural resources and scenic beauty of the Hudson Highlands region of New York State, where

agreed to pay $1,000,000 in cash to acquire an uncontaminated portion of the property, which would be preserved for outdoor recreation such as hiking, horseback riding, and bird watching. (Lusardi Reply Aff'n ¶¶ 33–34; Grossman Op. ¶ 1.)  The proceeds from the sale were to be held in escrow by the Receiver, who would use them to finance the remediation and restoration of the contaminated portions of the property.  (Lusardi Aff'n ¶ 17; Lusardi Reply Aff'n ¶ 35.)  After reviewing the motion papers and holding two hearings to consider the matter, Justice Grossman approved the sale on September 27, 2018.  (*See* Grossman Op. 21–22.)

Running out of options, Kaspar filed for Chapter 11 bankruptcy on November 4, 2018, the purpose of which, by his own admission, was "to prevent [the] sale of his property." (Appellee's Mot. 6 ¶ 1.)[7]

### 2.  Kaspar's Bankruptcy Proceeding

Shortly after Kaspar filed for bankruptcy, the Town moved the Bankruptcy Court to lift the automatic stay, pursuant to 11 U.S.C. § 362(b)(4) and (d)(1), so the Town might continue to prosecute its enforcement action against Kaspar in the exercise of "its police and regulatory powers."  (*See* Not. of Mot. (Bankr. Dkt. No. 26); Br. for Creditor-Appellant ("Appellant's Br.") 4 (Dkt. No. 8).)  The Town also filed a separate motion, pursuant to 11 U.S.C. § 543(d), to keep the state court-appointed Receiver, Mr. Donohue, in control of the property.  (*See* Not. of Mot.

---

the Appalachian Mountains cross the Hudson River."  Hudson Highlands Land Trust, *About HHLT*, HHLT.org, https://www.hhlt.org/about/ (last visited Dec. 16, 2020).

[7] It is difficult to square Kaspar's admission that he filed for bankruptcy "to prevent a sale of his property," (Appellee's Mot. 6 ¶ 1), with his repeated representation, early in the bankruptcy proceeding, that he did not oppose the sale, (*see, e.g.*, Letter from Matthew M. Cabrera, Esq., to Bankruptcy Court (Jan. 23, 2019) ("Jan. 23 Cabrera Letter") 2 (Bankr. Dkt. No. 42) ("The accepted offer on the contract on the proposed sale of the [p]roperty to [the Land Trust] is $1,000,000.  Mr. Kaspar supports this sale."); Lift-Stay Hearing Tr. 5:22–23 (observing that Kaspar "is not opposed to the underlying sale to the land trust and the dollar amount")).

(Bankr. Dkt. No. 21); Appellant's Br. 5.)  As counsel for the Town explained in an accompanying affidavit, keeping the Receiver in place was critical to effectuating the planned sale of property to the Land Trust.  (*See* Aff'n of Robert C. Lusardi, Esq., in Supp. of Mot. to Maintain Receiver ("Lusardi Receiver Aff'n") ¶ 21 (Bankr. Dkt. No. 21-1).)  Emphasizing the urgency of the matter, the Town explained that the Trust "ha[d] indicated that it [would] not wait to purchase the property more than a matter of months."  (*Id.*)  "[I]f the Receivership [were] terminated," the Town noted, "the relief directed by Justice Grossman [would] become moot and the opportunity to remediate the property [would] likely be lost."  (*Id.*)  Kaspar opposed each of the Town's motions.  (*See* Aff'n of Matthew M. Cabrera, Esq., in Opp'n to Mot. to Maintain Receiver 1 (Bankr. Dkt. No. 36) (arguing in part that the Town had "failed to explain why excusing [the Receiver's] compliance with [§] 543 serves the best interests of the creditors, or even why the continued appointment of a receiver is necessary"); Jan. 23 Cabrera Letter 2 (arguing that the Town "has chosen not to use its police power in nine years[,] . . . there is no evidence of any ongoing contamination or violation of any ordinances[,]" and thus, [t]here is no urgency that requires the [Bankruptcy] [C]ourt [to] lift the automatic stay or grant [the Town] any control of the sale of the [p]roperty").)[8]

---

[8] Kaspar has characterized the Receiver's stewardship of the property as a largely disastrous enterprise, accusing Donohue of failing to perform basic financial responsibilities and failing to remediate the property despite having years to do so.  (*See, e.g.*, Lift-Stay Hearing Tr. 10:8–17 ("Then they put the [R]eceiver into place, [but] he really doesn't manage the property. He collects some rent, he doesn't pay the liability insurance even though that was ordered by the [c]ourt. . . .  Doesn't pay the taxes, allows exemptions on the taxes to go, thereby[] increasing the tax bill.  Doesn't pay any of the mortgages on the property.  The properties go into foreclosure."); Jan. 23 Cabrera Letter 1 ("The Receiver, Bruce Donahue [sic], who [the Town] now moves to reinstate in [Kaspar's] bankruptcy, has had absolute control of the [p]roperty for over six years and has taken no action to remediate the [p]roperty . . . .").)  The Town, by contrast, argues that the long delay in remediation stems from Kaspar's "refus[al] to cooperate with the Receiver in paying for the cleanup of the property," and the fact that because "the property was vacant land with only a small horse boarding operation . . . generating

The Bankruptcy Court held a hearing on January 29, 2019, (Appellant's Br. 5), and granted each of the Town's motions on the record, (*see* Lift-Stay Hearing Tr. 24:3–12). At the conclusion of the hearing, the Honorable Cecelia G. Morris, Chief United States Bankruptcy Judge for the Bankruptcy Court ("Judge Morris"), explicitly advised that the Receiver had "to follow the bankruptcy [rules] now," which required the filing of monthly operating and status reports. (*See* Lift-Stay Hearing Tr. 24:17–25:8.) On April 12, 2019, the Bankruptcy Court issued a formal order (the "Lift-Stay Order") directing, *inter alia*: (i) that the automatic stay be terminated as to the Town "in the exercise of its police and regulatory power pursuant to 11 U.S.C. § 362(b)(4) and 11 U.S.C. § 362(d)(1); (ii) that the Receiver remain in place pursuant to 11 U.S.C. § 543(d) to complete the sale of the property to the Land Trust; and (iii) that the Receiver obtain and provide proof of insurance on the property and "submit monthly operating reports and monthly status reports." (*See* Lift-Stay Order 1–2 (Bankr. Dkt. No. 77).)

But as the Town concedes, the Receiver's counsel in the state-court proceedings, Joseph Maria ("Maria"), "did very little in the bankruptcy case," attending "very few court conferences," failing to "seek Bankruptcy Court retention[,] and [failing to] file operating reports." (Appellant's Br. 6.) Although the Receiver prepared operating reports as directed, his reports were filed not by his own counsel, but by counsel for the *Town*. (*Id.* (explaining that because "Mr. Donohue does not have electronic case filing facilities," the Town's counsel "performed the ministerial task of physically filing the operating reports and status reports," but averring that "[a]ll of the operating reports were compiled by Mr. Donohue and signed by him under penalty of perjury").) Moreover, the Receiver himself failed to appear at a status

---

approximately $1,500.00 a month in rent, the Receiver was unable to generate sufficient funds with which to [remediate] the property." (Lusardi Aff'n ¶ 10.)

conference on November 5, 2019, instead "sen[ding] [the Town] to provide a report on his behalf." (Order To Show Cause and Directing Receiver to Appear ("Bankruptcy OSC") 1 (Bankr. Dkt. No. 122).) At this conference, the Bankruptcy Court also learned that Receiver's counsel, Maria, had filed a fee request with the state court, (Appellee's Mot. 7 ¶ 5), notwithstanding the court's prior instruction that "no fees [were to] be paid until they [were] approved by th[e] [Bankruptcy] Court," (Lift-Stay Hearing Tr. 24:14–15). Accordingly, the following day, the Bankruptcy Court issued an order directing the Receiver to appear for a hearing and show cause why the court "should not reconsider" its previous decision to lift the automatic stay and retain the Receiver. (Bankruptcy OSC 1.) At a testy, eight-minute hearing on December 10, 2019, it quickly became clear the court's patience had reached an end. (*See* Tr. of Order to Show Cause Hearing ("OSC Hearing Tr.") 3:1, 10:9 (Bankr. Dkt. No. 140).) As the judge observed:

> The [R]eceiver [had] continued off on his own. He did not even think about the fact that this is a Bankruptcy Court and he has to report to a Bankruptcy Court. And he cannot use another creditor's lawyer. He did not hire his own lawyer. He did not hire a broker. He went out on his own. So you can stand there and say [this case is] seven years in the making, and it's not, and I've lost my temper.

(*Id.* at 5:23–6:5.) And later, addressing the Receiver himself, Judge Morris observed: "As someone that has been retained by this [c]ourt, you have responsibilities and you didn't bother to learn them . . . ." (*Id.* at 9:15–17.) Accordingly, the Bankruptcy Court reinstated the automatic stay and removed the Receiver. (*Id.* at 7:19–23.) The Bankruptcy Court formalized its ruling in an Order issued six days later (the "Reinstatement Order"). (*See* Order Removing the Receiver Bruce Donahue [sic] & Reimposing the Automatic Stay (Bankr. Dkt. No. 128).)

On December 27, 2019, the Town filed a motion for reconsideration (the "Reconsideration Motion"), pursuant to Federal Rules of Bankruptcy Procedure 9023 and 9024,

and Federal Rules of Civil Procedure 59(e) and 60(b)(1) and (6), asking the Bankruptcy Court to "restor[e] the termination of the automatic stay" and to "restore [Donohue]" as the Receiver for the property.  (*See* Not. of Recons. Mot. (Bankr. Dkt. No. 130).)  On January 14, 2020, the Bankruptcy Court heard oral arguments and denied the motion on the record, observing that the issue was for appellate review.  (*See* Tr. of Hearing on Motion to Reconsider 16:18–23 (Bankr. Dkt. No. 171).)  The court formally denied the motion by Order dated January 21, 2020 (the "Denial of Reconsideration").  (*See* Bankr. Dkt. No. 149.)

Despite the Bankruptcy Court's December 16, 2019 Reinstatement Order, and its subsequent Denial of Reconsideration on January 21, 2020, the Town did not move for a stay of the court's Reinstatement Order pursuant to Federal Rule of Bankruptcy Procedure 8007, and Kaspar's Chapter 11 bankruptcy has continued to move forward in the interim.  (*See* Appellee's Mot. 9 ¶ 19.)

B.  Procedural History

On December 27, 2019, the Town filed its Notice of Appeal of the Bankruptcy Court's Reinstatement Order.  (*See* Not. of Appeal (Bankr. Dkt. No. 129).)  On January 10, 2020, the Town filed its Designation of the Record on Appeal.  (*See* Designation of R. on Appeal (Bankr. Dkt. No. 143).)  After the Bankruptcy Court entered its Denial of Reconsideration on January 21, 2020, the Town attempted to file an Amended Notice of Appeal and Amended Designation of the Record on Appeal (the "Amended Notice and Record") two weeks later, on February 4, 2020, (*see* Appellant's Aff. ¶ 6), asking the Court to consider not only the Bankruptcy Court's Reinstatement Order, but also its subsequent Denial of Reconsideration, (*see* Am. Designation of R. on Appeal ¶¶ 39–46 (Dkt. No. 6)).  However, as the Town was about to file the Amended Notice and Record, it "learned that [it] could not use the identification and password which [it]

had previously used to file documents on electronic case filing in Bankruptcy Court."  (*See* Appellant's Aff. ¶ 6.)  The Town's counsel, Lewis Wrobel ("Wrobel"), called the Court's chambers and spoke with a law clerk, who advised him to file the amended papers by fax and then file the same documents electronically the following day.  (*Id.*)  Accordingly, the Town transmitted its Amended Notice and Record by fax on February 4, 2020 at 5:18 p.m.  (*See* Appellant's Aff. Ex. A ("Faxed Am. Appeal Docs."), at 2 (Dkt. No. 18-1).)[9]  As advised, the Town also filed these documents electronically the following day.  (*See* Dkt. Nos. 5–6.)

Kaspar filed the instant Motion To Dismiss the Appeal on April 22, 2020, (*see* Dkt. No. 12), and the Court suspended the briefing schedule in the underlying appeal the following day, (*see* Dkt. No. 14).  The Town filed its Opposition and supporting papers on May 15, 2020, (*see* Appellant's Aff.; Appellant's Mem. of Law in Opp'n to Mot. To Dismiss ("Appellant's Mem.") (Dkt. No. 19)), and Kaspar filed his Reply on May 22, 2020, (*see* Appellee's Mem. of Law in Further Supp. of Mot. To Dismiss ("Appellee's Reply") (Dkt. No. 21)).

On November 17, 2020, while the instant Motion was pending, the Bankruptcy Court authorized Kaspar to retain and employ Environmental Consulting and Management Services, Inc. ("ECMS") to coordinate the remediation of his property.  (*See* Order Authorizing the Retention & Employment of Environmental Consulting & Management Services, Inc. ("Retention Order") 2 (Bankr. Dkt. No. 223).)  Under the terms of Kaspar's application seeking retention of ECMS, the company "[will] spearhead [Kaspar's] rehabilitation plan on [the subject] [p]roperty, confirm [that] any and all hazardous materials [are] removed from the [p]roperty[,] and coordinate the remediation with the [NYSDEC] to ensure it meets all New York State

---

[9] Citations to this exhibit refer to the ECF stamp at the top of the page.

requirements." (Debtor's Appl. for Entry of Order Authorizing the Employment of ECMS ("Debtor's ECMS Appl.") 1–2 (Bankr. Dkt. No. 199-1).)

Accordingly, on November 23, 2020, this Court directed the Parties to submit supplemental briefs explaining why the underlying appeal had not been rendered moot by developments in the Bankruptcy Court, in particular Judge Morris's November 17 order authorizing the retention of ECMS (the Court's "Supplemental Briefing Order"). (*See* Suppl. Briefing Order 2 (Dkt. No. 22).) As the Court observed, "[t]he purpose of the Town's prolonged state-court litigation against Kaspar has been to remediate certain environmental damage on Kaspar's property and to bring the property into compliance with state and local land-use regulations." (*Id.* at 1.) The Bankruptcy Court's November 17 order, the Court noted, "appear[s] to effectuate this purpose." (*Id.* at 2.)

Pursuant to the Court's Order, Kaspar and the Town simultaneously filed supplemental briefing on December 4, 2020. (*See* Appellant's Suppl. Br. (Dkt. No. 23); Appellee's Suppl. Br. (Dkt. No. 24).)

## II.  Discussion

### A.  Standard of Review

District courts have jurisdiction to review final bankruptcy orders under 28 U.S.C. § 158(a)(1). *See In re DBSD N. Am., Inc.*, 634 F.3d 79, 88 (2d Cir. 2011) (noting that district courts have jurisdiction to "review all final judgments, orders, and decrees of the bankruptcy courts" (internal quotation marks omitted)). "[A] bankruptcy judge's order is final if it completely resolve[s] all of the issues pertaining to a discrete claim, including issues as to the proper relief." *Pegasus Agency, Inc. v. Grammatikakis (In re Pegasus Agency, Inc.)*, 101 F.3d 882, 885 (2d Cir. 1996). In addition, the Court has an independent obligation to determine its

jurisdiction to hear such an appeal.  *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428,

434 (2011) ("[F]ederal courts have an independent obligation to ensure that they do not exceed

the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions

that the parties either overlook or elect not to press.").

A district court reviews a bankruptcy court's findings of fact for clear error and reviews

conclusions of law de novo.  *See Lubow Mach. Co. v. Bayshore Wire Prods. Corp. (In re*

*Bayshore Wire Prods. Corp.)*, 209 F.3d 100, 103 (2d Cir. 2000) ("Like the [d]istrict [c]ourt, we

review the [b]ankruptcy [c]ourt's findings of fact for clear error, [and] its conclusions of law de

novo . . . ." (citation and italics omitted)); *Am. Home Assurance Co. v. Enron Nat. Gas Mktg.*

*Corp. (In re Enron Corp.)*, 307 B.R. 372, 378 (S.D.N.Y. 2004) ("A bankruptcy court's

conclusions of law are reviewed de novo and its findings of fact for clear error." (italics

omitted)).

B.  Analysis

Kaspar moves to dismiss the Town's appeal on three grounds.  First, he argues that the

Town's Amended Notice of Appeal was untimely, and thus, this Court lacks jurisdiction to

review the Bankruptcy Court's Denial of Reconsideration.  (*See* Appellee's Mot. 9–11.)  Second,

he argues that the Town is not "directly and adversely affected pecuniarily" by the Bankruptcy

Court's Reinstatement Order, and therefore lacks standing to invoke this Court's appellate

jurisdiction under 28 U.S.C. § 158.  (*See id.* at 13 (citation omitted).)  And third, Kaspar argues

that the Town is improperly seeking to assert the legal rights of the Receiver, a third party, and

that it lacks prudential standing to do so.  (*See id.* at 16–18.)

### 1.  Jurisdiction To Review Bankruptcy Court's Denial of Reconsideration

As stated, this Court has jurisdiction to hear appeals "from final judgments, orders, and decrees" of the Bankruptcy Court.  28 U.S.C. § 158(a)(1).  Rule 8002(a) of the Federal Rules of Bankruptcy Procedure provides that, "[e]xcept as provided in subdivisions (b) and (c), a notice of appeal must be filed with the bankruptcy clerk within 14 days after entry of the judgment, order, or decree being appealed."  Fed. R. Bankr. P. 8002(a)(1).  On December 27, 2019, the Town filed a timely Notice of Appeal with respect to the Bankruptcy Court's December 16, 2019 Reinstatement Order.  (*See* Bankr. Dkt. No. 129.)  The Town filed its Reconsideration Motion, "pursuant to Federal Rules of Bankruptcy Procedure 9023 and 9024," on the same day, also rendering it timely.  (*See* Not. of Recons. Mot. 1.)  *See also* Fed. R. Bankr. P. 9023 (providing that "[a] motion . . . to alter or amend a judgment shall be filed . . . no later than 14 days after entry of judgment").[10]  By filing its Reconsideration Motion at the same time it filed its Notice of Appeal, however, the Town effectively put its own appeal to this Court on hold.  Under Rule 8002, "[i]f a party files a notice of appeal after the [Bankruptcy Court] announces or enters a judgment, order, or decree—but before it disposes of [a motion for reconsideration]—the notice becomes effective when the order disposing of . . . such [a] motion is entered."  Fed. R. Bankr. P. 8002(b)(2); *see also Vaneck*, 2016 WL 386027, at *4 (concluding, pursuant to Rule 8002(b)(2),

---

[10] Although at least one court has stated that reconsideration motions are governed by Rule 9024, *see Vaneck v. DLJ Mortg. Cap., Inc.*, Nos. 15-CV-343, 15-CV-757, 2016 WL 386027, at *4 (D. Conn. Feb. 1, 2016), most courts have held that Rule 9023 governs such motions, *see, e.g.*, *Amelio v. Piazza*, Nos. 18-CV-8769, 18-CV-11420, 19-CV-314, 2019 WL 5199600, at *4 (S.D.N.Y. Aug. 27, 2019) ("Rule 9023 governs motions for reargument or reconsideration."); *Pu v. Grubin (In re Food Mgmt. Grp., LLC)*, 428 B.R. 576, 578 (S.D.N.Y. 2009) (treating a motion for reargument and reconsideration as a Rule 9023 motion, and gathering cases in support).  Whether the Town's Reconsideration Motion is properly brought pursuant to Rule 9023 or 9024, however, does not affect the instant analysis.

that where a debtor had "filed a notice of appeal at the same time that he filed a motion for reconsideration[,] . . . that notice was not effective until the motion for reconsideration was decided").[11]

As noted, the Bankruptcy Court entered its Denial of Reconsideration on January 21, 2020. (*See* Bankr. Dkt. No. 149.)  Under Rule 8002, "[i]f a party intends to challenge an order disposing of [a reconsideration motion,] . . . the party must file a notice of appeal or an amended notice of appeal."  Fed. R. Bankr. P. 8002(b)(3).  The filing of an amended notice, however, "must . . . be filed within the time prescribed by this rule, measured from the entry of the order disposing of [the reconsideration motion]."  *Id.*  Because Rule 8002 provides prospective appellants 14 days to file an appeal, the Town had until February 4, 2020—14 days after the Bankruptcy Court's Denial of Reconsideration was entered—to file its amended notice and supporting papers.  Although the Town's counsel tried to file its Amended Notice and Record via ECF on February 4, 2020, it realized late in the day that it "was no [sic] registered for the District Court," (Faxed Am. Appeal Docs. 3), and, after seeking guidance from one of the Court's law clerks, resorted to transmitting the documents via fax at 5:18 p.m., (*see id.* at 2).  The Amended Notice and Record were properly filed electronically the following day.

---

[11] Although the Town did not file its original Designation of the Record on Appeal until January 10, 2020, (*see* Bankr. Dkt. No. 143), Rule 8002 provides that if a party files a motion for reconsideration, "the time to file an appeal runs for all parties from the entry of the order disposing of" that motion.  Fed. R. Bankr. P. 8002(b)(1); *see also, e.g.*, *Amelio*, 2019 WL 5199600, at *4 (observing that "the rules permit an appellant to toll the time to appeal an order on a motion by filing a subsequent motion for reconsideration"); *Davison v. AMR Corp. (In re AMR Corp.)*, 566 B.R. 657, 664 (S.D.N.Y. 2017) (observing that "if a party timely files a motion to alter or amend a judgment under Rule 9023 . . . or for relief under Rule 9024 . . . , then the time to file a notice of appeal is tolled until the bankruptcy court enters an order resolving the motion").  Although here, as noted, the Town filed its Notice of Appeal simultaneously with its Reconsideration Motion, the filing of the latter motion extended the period in which the Town could file its Designation of the Record on Appeal.  Thus, the January 10 filing was timely.

Kaspar invokes *Statek Corp. v. Development Specialists, Inc. (In re Coudert Brothers LLP)*, 673 F.3d 180 (2d Cir. 2012), which held that "once the time to appeal [an order of a bankruptcy court] runs, a district court or bankruptcy appellate panel has no jurisdiction to consider an untimely appeal," *id.* at 185.  As *Coudert Brothers* recognized, Rule 8002(a)'s time limit "is jurisdictional, and in the absence of a timely notice of appeal in the district court, the district court is without jurisdiction to consider the appeal, regardless of whether the appellant can demonstrate excusable neglect."  *Id.* (ellipsis and internal quotation marks omitted) (quoting *Siemon v. Emigrant Sav. Bank (In re Siemon)*, 421 F.3d 167, 185 (2d Cir. 2012)).  In response to the Town's excuse for failing to timely file its Amended Notice and Record via ECF, Kaspar notes that although the Southern District's ECF Rules and Instructions "allow for an exemption to the filing requirements when there is a technical failure that causes the inability to file[,]" the Town "does not suggest that it was a technical failure which made the filing untimely." (Appellee's Reply 7.)  *See also* S.D.N.Y. ECF Rules & Instructions § 11 (Apr. 1, 2020) (providing that a user "whose filing is made untimely *as the result of a technical failure* may seek appropriate relief from the Court" (emphasis added)).  Kaspar also could have noted that under § 2.1 of the local ECF rules, "[a]ttorneys admitted to the bar of this Court, including those admitted *pro hac vice . . . , are required to register* as Filing Users of the Court's ECF system." *Id.* § 2.1 (emphasis added).  "Unless excused by the Court, attorneys not already Filing Users appearing in cases must register as Filing Users."  *Id.*

Yet, the Second Circuit has also recognized, in an analogous context, that a district court's "inherent authority . . . to overlook violations of, or depart from, its own local rules" also allows it "to overlook failures to comply with requirements of its electronic filing system." *Phoenix Glob. Ventures, LLC v. Phoenix Hotel Assocs., Ltd.*, 422 F.3d 72, 74 (2d Cir. 2005) (per

curiam) (holding that the district court did not abuse its discretion when it deemed a motion to remand, which was filed one day after expiration of a 30-day deadline, to be timely where the motion had been rejected by ECF due to an incorrect entry, where the defendants did not identify any prejudice arising from the one-day delay, and where "holding [the plaintiff] to the technical . . . requirements would have worked an injustice").  Thus, a "district court may, in its discretion, deem [a] motion [as having been] made on the date that the motion would have been filed but for failure to comply with requirements of the electronic filing system."  *Id.*  Applying these principles to the instant dispute, the Court concludes that the Amended Notice and Record were timely filed, notwithstanding the Town's failure to comply with the Southern District's ECF rules.  Although counsel's eleventh-hour blunder suggests less than model professionalism and preparation, counsel did make a good-faith effort to comply with the deadline and, upon realizing his mistake, acted quickly to remedy it, faxing the documents to chambers and electronically filing them on the docket the following day.  *Cf. Almonte v. Target Corp.*, 462 F. Supp. 3d 360, 364 (S.D.N.Y. 2020) (declining to deem a motion timely filed, pursuant to *Phoenix*, where the "[p]laintiff ha[d] not offered any excuse for her failure to act timely, . . . [or] even attempted to argue that she made a good faith effort to comply with the deadline"); *Scantek Med., Inc. v. Sabella*, No. 08-CV-453, 2008 WL 2518619, at *3–4 (S.D.N.Y. June 24, 2008) (same). Moreover, "[Kaspar] has identified no undue prejudice from the one-day delay caused by the [ECF] issues."  *Bisesto v. Uher*, No. 19-CV-1678, 2019 WL 2537452, at *5 (S.D.N.Y. June 20, 2019) (excusing a lawyer's one-day delay in filing a motion to remand, pursuant to *Phoenix*, where the defendant had not identified any prejudice caused by the delay).  Here, the Court concludes that "holding [the Town] to the technical . . . requirements would [ ] work[] an injustice," and thus, it will "overlook [the Town's] failure[] to comply with [the] requirements of

[the Court's] electronic filing system." *See Phoenix*, 422 F.3d at 74.  The Amended Notice and Record were timely filed, and thus, the Court has jurisdiction to hear an appeal of the Bankruptcy Court's Denial of Reconsideration.

<u>2.  The Town's Standing to Appeal Reinstatement of the Automatic Stay</u>

The Second Circuit and other courts have "adopted the general rule . . . that in order to have standing to appeal from a bankruptcy court ruling, an appellant must be 'a person aggrieved'—a person 'directly and adversely affected pecuniarily' by the challenged order of the bankruptcy court." *In re DBSD N. Am., Inc.*, 634 F.3d at 88–89 (quoting *Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744, 747 (2d Cir. 1991)).  In other words, an appellant "must show not only 'injury in fact' under Article III[,] but also that the injury is 'direct[]' and 'financial.'"  *Id.* at 89 (quoting *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 642 & n.2 (2d Cir. 1988)); *see also Ianello v. Lehman Brothers Holdings Inc. (In re Lehman Brothers Holdings, Inc.)*, No. 19-CV-6397, 2020 WL 1503473, at *1 (S.D.N.Y. Mar. 30, 2020) (observing that "[i]n practical terms," the heightened standing requirement in bankruptcy appeals "means that an '[a]ppellant cannot proceed with [an] appeal if [it] cannot demonstrate that [it] suffered a direct financial injury as a result of the [o]rder" (quoting *Assante v. E. Sav. Bank, FSB (In re Assante)*, No. 12-CV-5309, 2013 WL 787968, at *2 (S.D.N.Y. Mar. 4, 2013))).

The crux of Kaspar's argument is that the Town has not suffered a direct financial injury and therefore does not meet the heightened "aggrieved person" standard necessary to achieve standing.  (*See, e.g.*, Appellee's Mot. 14 (arguing that the Town "has failed to identify, set forth[,] or even mention that it has suffered any actual . . . direct financial injury"); Appellee's Reply 8 (arguing that the Town "has failed to explain how the [Reinstatement Order] will cause it financial harm or stop the Town from ultimately being paid").)  As Kaspar correctly notes, (*see*

Appellee's Reply 12), the issue of standing is not subject to waiver and may be raised by any

party, or by the court itself, at any stage in the litigation.  *See Johnston v. Johnston*, 536 B.R.

576, 586 (D. Vt. 2015) (rejecting an argument that the appellant lacked standing to appeal an

order of the bankruptcy court because it had failed to raise the issue in the bankruptcy court, and

observing that "[t]he question of standing is not subject to waiver" and "'may be raised at any

time' by any party or by the court sua sponte" (citation and italics omitted)); *see also Grupo

Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 571 (2004) ("Challenges to subject-matter

jurisdiction can of course be raised at any time prior to final judgment."); *United States v. Hays*,

515 U.S. 737, 742 (1995) ("The question of standing is not subject to waiver . . . ."); *Carter v.

HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (stating that the issue of standing "may

be raised by a party, or by a court on its own initiative, at any stage in the litigation" (quoting

*Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006))); *Cent. States Se. & Sw. Areas Health &

Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005)

(explaining that "[b]ecause the standing issue goes to [a] [c]ourt's subject matter jurisdiction, it

can be raised sua sponte" on appeal (italics omitted)); *Kelen v. Nordstrom, Inc.*, 259 F. Supp. 3d

75, 79 (S.D.N.Y. 2016) ("Defects in subject matter jurisdiction may be raised at any time during

the proceedings." (citation and ellipsis omitted)).  The Town's assertion to the contrary, (*see*

Appellant's Mem. 2–3), is simply wrong.

But "[w]hile the 'pecuniary interest' formulation is an often used and often useful test of

standing in the bankruptcy context, it 'is not the only test.'"  *Adams v. Zarnel (In re Zarnel)*, 619

F.3d 156, 162 (2d Cir. 2010) (quoting *Morgenstern v. Revco D.S., Inc. (In re Revco)*, 898 F.2d

498, 499 (6th Cir. 1990)).  Joining several of its sister circuits, the Second Circuit has recognized

that "even absent a direct pecuniary interest in the litigation, a *public* interest may also give a

sufficient stake in the outcome of a bankruptcy case to confer appellate standing." *Id.* (citation and internal quotation marks omitted).

Courts most commonly invoke this "public interest" standard to recognize the appellate standing of a U.S. Trustee. *See, e.g., id.* (concluding "that the U.S. Trustee's responsibility to represent and protect the public interest affords it a substantial interest in, and therefore standing to proceed with, this appeal"); *see also U.S. Tr. v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.)*, 33 F.3d 294, 295–99 (3d Cir. 1994) (concluding that U.S. Trustee had appellate standing in a Chapter 11 case based on "general policies of public interest standing[] and the overwhelming weight of the case law," and gathering cases in support); *U.S. Tr. for W. Dist. of Va. v. Clark (In re Clark)*, 927 F.2d 793, 795–96 (4th Cir. 1991) (holding that U.S. Trustee had standing to pursue appeal in a Chapter 7 bankruptcy based on "public interest" standing); *In re Plaza de Diego Shopping Ctr., Inc.*, 911 F.2d 820, 824 (1st Cir. 1990) (same with respect to Chapter 11 bankruptcy); *In re Revco*, 898 F.2d at 499–500 (same). Courts have also recognized the public interest standing of other governmental parties such as the U.S. Securities and Exchange Commission ("SEC"), *see SEC v. U.S. Realty & Improvement Co.*, 310 U.S. 434 (1940), and the Secretary of Labor, *see U.S. Dep't of Labor v. Kirschenbaum*, 508 B.R. 257, 263–64 (E.D.N.Y. 2014).

In response to Kaspar's Motion, the Town tries to invoke both the "pecuniary interest" and "public interest" standards as its bases for appellate standing. (*See* Appellant's Mem. 1–2.) But the Town cannot have it both ways. In the Bankruptcy Court, the Town emphasized that it was acting solely in the exercise of its police and regulatory power "to enforce its land use and zoning ordinances," and did "not seek monetary fines or penalties." (*See, e.g.*, Lusardi Aff'n ¶ 22.) Although the Town's enforcement action resulted in the appointment of a Receiver who

had planned to sell the property, the sole purpose of this sale was to generate funds for remediating the property; any proceeds remaining after remediation were to be returned to Kaspar. (Lusardi Receiver Aff'n ¶ 17 (affirming that, under the plan approved by Justice Grossman, "[a]ny funds remaining after the remediation was completed, and the Receiver's fees and expenses paid, would be returned to [Kaspar]"); Grossman Op. 22 (ordering that "upon the completion of the duties of the Receiver and payment of obligations, any funds remaining in the Receiver's control shall be delivered to Defendants"); Lift-Stay Hearing Tr. 8:12–18 (noting that any sale proceeds remaining after remediation were to be returned to Kaspar).) In other words, the purpose of the Town's enforcement action was not to generate revenue for the Town's coffers, but to enforce land-use regulations and repair environmental damage in the public interest. The Town's representations and submissions to the Bankruptcy Court undermine its belated attempt to ground standing in a pecuniary interest. (*See* Appellant's Mem. 1.)[12]

---

[12] The Town devotes a single perfunctory paragraph to its argument that it has standing based on a pecuniary interest, (*see* Appellant's Mem. 1), which is understandable considering the argument lacks legal or factual support. The Town asserts that it "has a financial interest in the case as described by its two filed claims totaling nearly $3,100,000." (*Id.*) In an accompanying affidavit, the Town's counsel explains that the Town "filed a pre-petition claim in the sum of $3,000,000.00, the amount necessary to cover the cost of remediation of environmental waste." (Appellant's Aff. ¶ 10.) As explained *supra*, however, the proceeds used to cover remediation expenses will not go toward the Town's coffers. If the Court were ultimately to reverse the Bankruptcy Court's Reinstatement Order, and the Town succeeded in arranging a sale of the property, any leftover proceeds, as noted, would be returned to Kaspar.

Town counsel also notes that the Town "filed a proof of claim in the sum of $87,112.09 for [] delinquent 2020 real property taxes. (*Id.*) Maybe so, but this assertion shows that the Town fundamentally misapprehends the "pecuniary interest" standard. To establish that it is a "person aggrieved" for purposes of appellate standing, the Town must show that it has been "directly and adversely affected pecuniarily *by the challenged order of the bankruptcy court*." *In re Zarnel*, 619 F.3d at 160 (internal quotation marks and citation omitted; emphasis added). Here, the "challenged order" of the Bankruptcy Court reimposes the automatic stay with respect to the Town's state-court enforcement action that began in 2006 and culminated in the 2018 Grossman Opinion. Stated differently, the Reinstatement Order has nothing to do with the Town's collection of 2020 taxes, so the Town cannot invoke its proof of claim for delinquent

The Town's attempt to establish appellate standing based on a direct pecuniary injury is also inconsistent with the entire premise of its underlying appeal, which is that the automatic stay should again be lifted pursuant to the so-called police-powers exception, which exempts from the automatic stay:

> the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's . . . police or regulatory power[.]

11 U.S.C. § 362(b)(4).  (*See* Appellant's Br. 3.)[13]  This exception, the Town should note, applies only to governmental actions that address an injury to the public interest, rather than a financial injury to the governmental unit itself.  As then-District (now Circuit) Judge Joseph Bianco explained in *Solis v. SCA Restaurant Corp.*, 463 B.R. 248 (E.D.N.Y. 2011), "[i]n attempting to apply the § 362(b)(4) exception, courts look to the purposes of the law that the government seeks to enforce to distinguish between situations in which a state acts pursuant to its 'police and regulatory power,' and where the state acts merely to protect its status as a creditor," *id.* at 251 (citation and some internal quotation marks omitted).

---

2020 taxes as evidence of how it has been "directly and adversely affected pecuniarily" by the challenged order of the Bankruptcy Court.  *Id.*

[13] At the January 2019 Lift-Stay Hearing, Judge Morris surveyed the history of the Town's enforcement action against Kaspar and briefly discussed relevant case law construing this exception.  (*See* Lift-Stay Hearing Tr. 22:8–24:2.)  Having recounted the litigation history between Kaspar and the Town, and having observed that "[a]ction[s] brought to enjoin land use ordinances and zonings have been uniformly held to be among the police and regulatory powers referred to by the [Bankruptcy] Code," Judge Morris concluded that, "[f]or these reasons," the automatic stay would be lifted to allow the Town to continue pursuing its enforcement action against Kaspar.  (*Id.* at 22:16–18, 24:3–8.)  As noted, the Bankruptcy Court entered the formal Lift-Stay Order several months thereafter.  (*See* Bankr. Dkt. No. 77.)

Historically, courts have invoked two tests to address this question.  *Id.* at 252.  Under the "pecuniary purpose" or "pecuniary interest" test, courts consider "whether a governmental proceeding relates to public safety and welfare, which favors application of the stay exception, or to the government's interest in the debtor's property, which does not."  *Id.* (citing *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig.*, 488 F.3d 112, 133 (2d Cir. 2007)); *see also In re Gen. Motors LLC Ignition Switch Litig.*, 69 F. Supp. 3d 404, 410 (S.D.N.Y. 2014) (observing that "courts typically apply the 'pecuniary purpose' test, asking whether the governmental action relates primarily to the government's pecuniary interest in the debtor's property or to matters of safety and welfare" (citation, alteration, and some internal quotation marks omitted)).  If the court determines that a governmental action "is primarily for the purpose of protecting a pecuniary interest," then it should decline to lift the stay.  *Solis*, 463 B.R. at 252 (citation omitted).[14]  Under the second test—the "public policy" test—courts seek to distinguish "between proceedings that adjudicate private rights and those that effectuate public policy," and, in the event the action furthers both such interests, the court will exempt an action from the automatic stay if "the private interests do not significantly outweigh the public benefit from enforcement."  *Id.* (citation omitted).

The Second Circuit has yet to determine which of the two tests courts ought to apply, *see MTBE*, 488 F.3d at 133 ("[W]e do not find it necessary to pass on the validity of these tests at this time . . . ."); *Gen. Motors*, 69 F. Supp. 3d at 410 (observing that "the Second Circuit has

---

[14] As Judge Bianco explained in *Solis*, some courts "have backed away from the 'pecuniary purpose' test" in favor of a "broader 'pecuniary advantage' test," which asks "not whether the governmental unit seeks property of the debtor's estate, but rather whether the specific acts that the government wishes to carry out would create a pecuniary advantage for the government vis-à-vis other creditors."  *Solis*, 463 B.R. at 252 (citing *United States v. Commonwealth Cos., Inc. (In re Commonwealth Cos., Inc.)*, 913 F.2d 518, 523–25 (8th Cir. 1990); *United States ex rel. Jane Doe 1 v. X, Inc.*, 246 B.R. 817, 820 (E.D. Va. 2000)).

never ruled on the validity of these tests"); *Solis*, 463 B.R. at 253 (noting same); *FTC v. Consumer Health Benefits Ass'n*, No. 10-CV-3551, 2011 WL 2341097, at *2 (E.D.N.Y. June 8, 2011) (report and recommendation) ("The Second Circuit has yet to pass on the validity of any particular test."), and "there also appears to be some confusion in the case authority as to whether both the pecuniary test and the public purpose test must be satisfied for an action to be exempted, or whether one is sufficient," *Solis*, 463 B.R. at 252 (gathering cases).  However, the "tests are overlapping to some extent," *id.*, and the Second Circuit "has found them to be met when cases 'relate primarily to matters of public health and welfare, and the money damages sought will not inure, strictly speaking, to the economic benefit of the states,' but rather, are brought to further 'significant areas of state policy,'" *Gen. Motors*, 69 F. Supp. 3d at 410 (alteration omitted) (quoting *MTBE*, 488 F.3d at 133).

The Court need not apply these tests to resolve the instant Motion.  In light of the principles outlined above, however, the Town's attempt to assert a direct pecuniary injury, (*see* Appellant's Mem. 1), is fundamentally at odds with its underlying reliance on the police-powers exception, which is indeed its last, best hope for having the automatic stay lifted yet again.

But if the Town's appellate standing cannot be predicated on a "direct[] and adverse[]" pecuniary injury, *see In re DBSD N. Am., Inc.*, 634 F.3d at 88–89, its only alternative basis for surviving dismissal of its appeal is public interest standing.  The Court has not located authority that exhaustively considers the scope of public interest standing and formally holds that it may be extended to municipal governments enforcing land-use and environmental regulations.  However, a number of courts have assumed that governmental units have appellate standing to challenge bankruptcy court orders when acting in furtherance of their police and regulatory

powers, particularly where, as here, the challenged order involves a challenge to the automatic stay.

In *Penn Terra Limited v. Department of Environmental Resources, Commonwealth of Pennsylvania*, 733 F.2d 267 (3d Cir. 1984), Pennsylvania's Department of Environmental Resources ("DER") sought to lift the automatic stay in order to enforce a state court order compelling the debtor, a defunct mining company, to undertake various environmental remediation measures, *id.* at 270 & n.3.[15]  The bankruptcy court declined to lift the automatic stay, DER appealed, and the district court affirmed, reasoning that:

> although the DER's action was ostensibly undertaken to enforce state environmental laws, the effect of the action, in light of the disparity between the costs and funds available to do the reclamation work, was to collect a money judgment against [the debtor]; the purpose was not only to enforce a regulation, but to exhaust the debtor's assets.

*Id.* at 270 (record citation omitted).  The district court, like the bankruptcy court before it, thus relied on the so-called "exception to the [police-powers] exception," which provides that "actions to enforce money judgments *are* [subject to] the automatic stay, even if they otherwise [are] in furtherance of the [s]tate's police powers."  *Id.* at 272 & n.5.[16]  The Third Circuit reversed, concluding not only that DER's action was an exercise of police and regulatory powers subject to the police-powers exception, *see id.* at 274 ("DER seeks to force [the debtor] to rectify

---

[15] *Penn Terra* has been called the "leading case on environmental exceptions to the automatic stay."  *Graham v. State of W. Va. (In re War Eagle Constr. Co., Inc.)*, 283 B.R. 193, 198 (S.D. W. Va. 2002).

[16] At the time *Penn Terra* was decided, the "exception to the exception" was located in what was then 11 U.S.C. § 362(b)(5).  *See Penn Terra*, 733 F.2d at 272 (explaining that "[s]ubsection 362(b)(5) . . . creates a further 'exception to the exception'").  Subsequent amendments to § 362 moved the "exception to the exception" to § 362(b)(4), where it remains to this day.  *See* 11 U.S.C. § 362(b)(4) (exempting from the automatic stay "the enforcement of a judgment *other than a money judgment*, [that is] obtained in an action . . . by [a] governmental unit to enforce [its] police or regulatory power" (emphasis added)).

harmful environmental hazards.  No more obvious exercise of [Pennsylvania's] power to protect

the health, safety, and welfare of the public can be imagined."), but also that DER's action did

not constitute the enforcement of a money judgment, *id.* at 274–78.  As the Third Circuit

explained, a money judgment requires "(1) an identification of the parties for and against whom

judgment is being entered, and (2) a *definite* and *certain* designation of the amount which

plaintiff is owed by defendant."  *Id.* at 275.  A proceeding to *enforce* that money judgment—

which the police-powers exception does *not* exempt from the automatic stay—arises "when,

having obtained a judgment for a sum certain, a plaintiff attempts to seize property of the

defendant in order to satisfy that judgment.  It is this seizure of a defendant-debtor's property, to

satisfy the judgment obtained by a plaintiff-creditor, which is proscribed by [the police-powers

exception]."  *Id.* (footnote omitted).  Because the purpose of DER's action was to compel

environmental remediation, the court explained, it did not constitute the enforcement of a money

judgment:

> [I]t is clear to us that the proceeding initiated by DER in [state] [c]ourt was not to
> enforce a money judgment.  Indeed, it could not have resulted even in the mere
> entry of a money judgment.  DER brought its action in equity to compel the
> performance of certain remedial acts by [the debtor].  It did not seek the payment
> of compensation to the [state's] coffers, and the injunction actually issued by the
> [state] [c]ourt did not direct such payment.  This proceeding, therefore, could never
> have resulted in the adjudication of liability for a sum certain, an essential element
> of a money judgment.  Since this action was in form and substance . . . not one to
> obtain a money judgment, it follows that it could not be one to *enforce* the payment
> of such a judgment.

*Id.*  The court also considered—and rejected—the bankruptcy court's reasoning that although

DER's enforcement action sounded in equity, it was "in essence the attempted enforcement of a

money judgment" because it "[sought] a mandatory injunction requiring the debtor's expenditure

of funds for the correction of [environmental] violations."  *Id.* at 277 (citation omitted).  This

definition of "money judgment," the court explained, was "unduly broad," for "in contemporary

times, almost everything costs something.  An injunction which does not compel some

expenditure or loss of moneys may often be an effective nullity."  *Id.* at 278.  The court

continued:

> Here, the [state] [c]ourt injunction was, neither in form nor substance, the type of
> remedy traditionally associated with the conventional money judgment. . . .  No
> monies were sought by the [state] as a creditor or obligee.  The [state] was not
> seeking a traditional form of damages in tort or contract, and the mere payment of
> money, without more . . . could not satisfy the [state] [c]ourt's direction to
> [undertake various environmental remediation measures].  Rather, the [state]
> [c]ourt's injunction was meant to prevent future harm to, and to restore, the
> environment.

*Id.*  But perhaps the most significant aspect of the Third Circuit's decision, for purposes of

resolving the instant Motion, is that the court did not question DER's standing to appeal the

bankruptcy court or district court's orders.  Despite no suggestion that DER had been "directly

and adversely affected pecuniarily" by the challenged order of the bankruptcy court, *see In re

Zarnel*, 619 F.3d at 160, the Third Circuit assumed that DER had standing to challenge the order.

The parallels between this case and *Penn Terra* are striking.  Here, like the DER in *Penn

Terra*, the Town won injunctive relief to compel a defendant (subsequently a debtor) to perform

certain environmental remediation activities.  The most notable distinction is that here, the

Town's enforcement action ultimately culminated in the appointment of a Receiver who took

charge of and eventually negotiated a sale of the property.  But this form of relief is to be

distinguished from the paradigmatic enforcement of a money judgment, as described in *Penn

Terra*, in which "a plaintiff attempts to seize property of the defendant in order to satisfy [a

judgment for a sum certain]."  *Penn Terra*, 733 F.2d at 275.  As already discussed, the sole

purpose of the Receiver's proposed sale was to generate funds for remediating the damaged

property, and any leftover proceeds were to be returned to Kaspar.  Much like the facts in *Penn

Terra*, then, "[n]o monies [are] sought by the [Town] as a creditor or obligee"; "[t]he [Town] [is]

not seeking a traditional form of damages in tort or contract, and the mere payment of money, without more, . . . [will] not satisfy" Justice O'Rourke's March 2009 Consent Order and the subsequent state court orders seeking to effectuate its directives.  *See id.* at 278.  The Town's enforcement action, and the equitable relief ordered in response, "[were] meant to prevent future harm to, and to restore, the environment."  *See id.*  Much as the Third Circuit assumed in *Penn Terra* that the DER had appellate standing based on its protection of the public interest, this Court now concludes that the Town has appellate standing to prosecute the instant appeal on the same basis.

The Court's conclusion is consistent with case authority that has emerged in the years after *Penn Terra*.  In *Word v. Commerce Oil Co. (In re Com. Oil Co.)*, 847 F.2d 291 (6th Cir. 1988), Tennessee's Commissioner of Health and Environment (the "Commissioner") sought to lift the automatic stay in order to fix liability for civil penalties and damages against the defendant, who had illegally discharged pollutants into a local waterway, *id.* at 292.  The Bankruptcy Court determined that the Commissioner's "review and determination of civil fines and penalties was an action on a claim against the debtor's estate," and therefore fell outside the police-powers exception.  *Id.* at 292–93.  The Commissioner appealed, and the district court affirmed.  *Id.* at 293.  Applying the pecuniary purpose and public policy tests, the Sixth Circuit reversed, concluding that "the actions of the [Commissioner] in this case were regulatory in nature and therefore f[e]ll within the police power exception to the automatic stay."  *Id.* at 295; *see also id.* (observing that although "the state's actions should have been stayed under 11 U.S.C. § 362 if the state was seeking a monetary sum merely as collection of a debt or as compensation for reclamation it had already performed[,]" in fact, the Commissioner's actions "ha[d] not been undertaken for primarily pecuniary purposes[:] Neither the initial assessment,

nor the administrative review of the assessment was primarily an adjudication of private rights or interests in the debtor's estate"); *id.* at 296 ("[I]t is difficult to see what pecuniary advantage the state sought to gain in the debtor's estate or what pecuniary purpose would be served assessing civil liability against [the defendant]."). As in *Penn Terra*, the Sixth Circuit implicitly recognized the state government's standing to appeal an order of the Bankruptcy Court when its action was "regulatory in nature" and was not "undertaken for primarily pecuniary purposes." *See id.* at 295.

Similarly, in *In re Bankruptcy Appeal of Allegheny Health, Education & Research Foundation*, 252 B.R. 309 (W.D. Pa. 1999), the Pennsylvania Attorney General (the "AG") sought to lift the automatic stay to enforce a state court order that would prevent the defendants—various institutions in a "statewide umbrella system of healthcare institutions"— from disposing of assets or tampering with the composition of their respective boards of directors, *id.* at 316. The bankruptcy court declined to lift the stay, and the AG appealed. *See id.* at 316–20. On appeal, the district court concluded that the AG's state court action fell within the police powers exception, as the AG was acting in "its role as the sole champion of the public health, safety and welfare in matters affecting charitable trusts and foundations for which the public is an intended beneficiary." *Id.* at 328; *see also id.* ("The Commonwealth's actions relate primarily to protection of the public health and welfare and not to advance a private, pecuniary interest, and are to effectuate the public interest, not to adjudicate private rights . . . ."). As in *Penn Terra* and *Commerce Oil*, the court assumed that the governmental unit, acting in furtherance of its police and regulatory power, had standing to appeal an adverse order of the bankruptcy court. Likewise, in *FTC v. First Alliance Mortgage Co. (In re First Alliance Mortgage Co.)*, 264 B.R. 634 (C.D. Cal. 2001), the district court assumed that Massachusetts,

Illinois, and Florida—all of whom, the court concluded on appeal, were acting pursuant to the police-powers exception—had appellate standing to challenge a bankruptcy order finding that the exception did not apply, *see id.* at 643, 645–51.

In view of this authority, and for the reasons already discussed, the Court holds that the Town has standing to prosecute its appeal based on its representation of the public interest.[17, 18]

### 3. Equitable Mootness

As noted *supra*, on November 23, 2020, the Court directed the Parties to submit supplemental briefs explaining why the Town's underlying appeal has not been rendered moot by subsequent developments in the Bankruptcy Court. As the Town has represented to numerous judges over the course of more than a decade, its sole objective is to remediate the environmental damage on Kaspar's property. Thus, the Town seemingly should have welcomed Judge Morris's November 17, 2020 order authorizing Kaspar to retain and employ ECMS, who "[will] spearhead [Kaspar's] rehabilitation plan on [the subject] [p]roperty, confirm [that] any and all hazardous materials [are] removed from the [p]roperty[,] and coordinate the remediation with the [NYSDEC] to ensure it meets all New York State requirements." (*See* Retention Order

---

[17] In concluding that the Town has standing to prosecute its appeal, the Court does not mean to conflate public interest standing with the police-powers exception, each of which remains a distinct doctrine. But as the foregoing analysis suggests, these doctrines implicate many of the same questions. Indeed, to the extent a court's application of the police-powers exception leaves public-interest standing as the only plausible ground for appellate standing, as in the cases just discussed, it is clear these doctrines are closely intertwined.

[18] Because the Court concludes that the Town has standing to appeal the Reinstatement Order based on its representation of the public interest, and because that prong of the Reinstatement Order reimposing the automatic stay clearly affects the *Town's* ability to prosecute its enforcement action, the Court need not address that portion of the Reinstatement Order addressing the Receiver, and thus, it need not reach Appellee's prudential standing argument, (*see* Appellee's Mem. 16–18).

2; Debtor's ECMS Appl. 1–2.)  This rehabilitation, after all, has been the whole point of the Town's dogged 14-year battle.

But although the Court provided the Town with 10 pages in which to address the issue of mootness, the Town filed a single page as its response to the Court's Order.  (*See* Appellant's Suppl. Br. 1.)  Two of the three paragraphs in the Town's submission recount the basic procedural history of the appeal and summarize the Town's argument on appeal.  In its third paragraph, the Town finally turns to the question posed by the Court, asserting in conclusory fashion that "[t]he retention of ECMS as environmental consultant does not moot the issues raised in the appeal of [the Town] and therefore it would also not moot the motion to dismiss." (*Id.*)  Although the Town acknowledges that "ECMS will assist [Kaspar] in the elimination of hazardous waste," it then states that the Town's legal rights "are neither assisted nor degraded by the work of ECMS."  (*Id.*)  Not a single case is cited.  In short, the Town had no answer for the Court's inquiry, which is perhaps to be expected given the increasingly tenuous legal position in which the Town finds itself.

Constitutional mootness "is a doctrinal restriction stemming from the Article III requirement that federal courts decide only live cases or controversies; a case is moot if 'the parties lack a legally cognizable interest in the outcome' of the case."  *In re Zarnel*, 619 F.3d at 162 (quoting *Fox v. Bd. of Trs. of State Univ. of N.Y.*, 42 F.3d 135, 140 (2d Cir. 1994)).  The mootness doctrine comes into play "when interim relief or events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur."  *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 647 (2d Cir. 1998).

In the bankruptcy context, courts have developed a distinct, albeit related doctrine known as "equitable mootness," which is a "prudential doctrine under which the district court may

dismiss a bankruptcy appeal 'when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable.'" *R² Invs., LDC v. Charter Commc'ns, Inc. (In re Charter Commc'ns, Inc.)*, 691 F.3d 476, 481 (2d Cir. 2012) (quoting *Off. Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. Inc. v. Off. Comm. of Unsecured Creditors of LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 988 F.2d 322, 325 (2d Cir. 1993) ("*Chateaugay I*")); *see also Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 143–44 (2d Cir. 2005) (noting that "[e]quitable mootness is a doctrine distinct from constitutional mootness, though they have been discussed in the same breath").  The equitable mootness doctrine has emerged "in response to the particular problems presented by the consummation of plans of reorganization under Chapter 11," and it is "grounded in the notion that, with the passage of time after a judgment in equity and implementation of that judgment, effective relief on appeal becomes impractical, imprudent, and therefore inequitable." *Beeman v. BGI Creditors' Liquidating Tr. (In re BGI, Inc.)*, 772 F.3d 102, 107 (2d Cir. 2014) (citations omitted).  In contrast to constitutional mootness, which depends on whether there is a justiciable case or controversy, equitable mootness "is concerned with whether a particular remedy can be granted without unjustly upsetting a debtor's plan of reorganization." *Charter Commc'ns*, 691 F.3d at 481; *see also Metromedia*, 416 F.3d at 144 ("Equitable mootness is a prudential doctrine that is invoked to avoid disturbing a reorganization plan once implemented."); *U.S. Bank Nat'l Ass'n v. Windstream Holdings, Inc. (In re Windstream Holdings, Inc.)*, No. 20-CV-4276, 2020 WL 6434762, at *2 (S.D.N.Y. Nov. 2, 2020) (explaining that "[e]quitable mootness does not deprive a court of jurisdiction over a case in the same way that constitutional mootness does[,]" because whereas "[c]onstitutional mootness stems from a court's 'inability' to grant effective relief, . . . the doctrine of equitable

mootness describes a court's 'unwillingness to alter the outcome' of a bankruptcy proceeding" (citation omitted)).  Application of the doctrine "admits of considerable flexibility," *In re BGI, Inc.*, 772 F.3d at 107, requiring the district court "to carefully balance the importance of finality in bankruptcy proceedings against the appellant's right to review and relief," *Charter Commc'ns*, 691 F.3d at 481.  Indeed, the Second Circuit has admonished courts to apply the doctrine "with a scalpel rather than an axe."  *Id.* (citation omitted).

 Dismissing an appeal based on equitable mootness "is appropriate when the appellant has made no effort to obtain a stay and has permitted such a comprehensive change of circumstances to occur as to render it inequitable for the appellate court to reach the merits of the appeal." *Chateaugay I*, 988 F.2d at 325 (citation and internal quotation marks omitted); *see also B & M Inv., LLC v. Calise (In re Calise)*, 354 F. App'x 510, 513 (2d Cir. 2009) (summary order) (observing that the equitable mootness doctrine is appropriately "applied in two situations: when an unstayed order has resulted in some comprehensive change in circumstances, and when a reorganization is substantially consummated" (citation and alteration omitted)); *Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65, 80 (S.D.N.Y. 2010) (recognizing that equitable mootness has been applied when a reorganization is "substantially consummated" and when an unstayed order has resulted in a "comprehensive change in circumstances" (citation omitted)); *RM 18 Corp. v. Aztec Assocs., L.P. (In re Malese 18 Corp.)*, 426 B.R. 44, 48 (E.D.N.Y. 2010) (same); *Kenton Cnty. Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 374 B.R. 516, 522 (S.D.N.Y. 2007) (same).  As the Supplemental Briefing Order suggested, the Court is focused on whether there has indeed been a "comprehensive change in

circumstances." *See Chateaugay I*, 988 F.2d at 325.[19]  As noted, the Town did not move for a stay of the Bankruptcy Court's Reinstatement Order.  (Appellee's Mot. 9 ¶ 19; *see generally* Bankr. Dkt.)  Now, over a year after the Bankruptcy Court reinstated the automatic stay, Kaspar's Chapter 11 proceeding has continued to progress, and the Bankruptcy Court has approved Kaspar's retention of an environmental consultant to oversee and coordinate the rehabilitation of Kaspar's property—the same relief the Town has long sought.

Of course, "[i]n both cases of substantial consummation and a comprehensive change in circumstances, an appellant may avoid [equitable] mootness on appeal by showing that *all* of the following factors are met:

> (a) the court can still order some effective relief,
>
> (b) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity,
>
> (c) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court,
>
> (d) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings, and
>
> (e) the appellant pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order . . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from.

---

[19] The second situation in which equitable mootness is applicable—i.e., substantial consummation of a debtor's plan of reorganization—is statutorily defined in 11 U.S.C. § 1101, which provides that a reorganization is substantially consummated when there has been "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan"; and, finally, "(C) commencement of the distribution under the plan." *In re BGI, Inc.*, 772 F.3d at 108 (quoting 11 U.S.C. § 1101(2)).  The Court need not address this second scenario.

*In re Malese 18 Corp.*, 426 B.R. at 48–49 (quoting *Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 10 F.3d 944, 952 (2d Cir. 1993) ("*Chateaugay II*")); *see also In re Delta Air Lines, Inc.*, 374 B.R. at 523 (reciting the same five factors and observing that "[w]hile the Court of Appeals has not expressly formulated a test for when a 'comprehensive change of circumstances' renders it inequitable to hear an appeal, courts have found the same five equitable considerations listed above that can defeat a claim of mootness in the context of 'substantial consummation' to be instructive as well in the context of a 'comprehensive change of circumstances'").  Of these five factors, the fifth is the most consequential.  *See In re Metromedia Fiber Network, Inc.*, 416 F.3d at 144–45 (concluding that an appeal was equitably moot in light of the appellant's failure to seek a stay of the challenged order and describing this factor as a "[c]hief consideration" in the relevant analysis); *Chateaugay I*, 988 F.2d at 326 ("The party who appeals without seeking to avail himself of that protection does so at his own risk."); *In re Malese 18 Corp.*, 426 B.R. at 49 (dismissing an appeal as equitably moot based on the appellant's failure "diligently [to] pursue[] a stay of proceedings pending appeal," and invoking the Second Circuit's conclusion "that a party's failure to seek a stay of a bankruptcy order on appeal weighs heavily in favor of finding equitable mootness").  Indeed, the Second Circuit "insist[s] that a party seek a stay even if it may seem highly unlikely that the bankruptcy court will issue one."  *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 144.  Thus, "[i]n the absence of any request for a stay, the question is not solely whether [a court] *can* provide relief without unraveling the [plan of reorganization], but also whether [a court] *should* provide such relief in light of fairness concerns."  *Id.* at 145 (citing *Chateaugay II*, 10 F.3d at 952–53; *Chateaugay I*, 988 F.2d at 325).

The Court is not yet prepared, based on the limited factual record and briefing before it, to dismiss the Town's appeal as equitably moot.  To resolve the narrow, jurisdictional question presented by the instant Motion—namely, whether the Town has standing to prosecute its appeal—the Court need not make the prudential determination encompassed by the equitable mootness doctrine.  But given the principles discussed above, the Town's puzzling failure to seek a stay of the Reinstatement Order spells trouble for its prospects on the merits of the underlying appeal, particularly in light of subsequent developments in the Bankruptcy Court.  Should the Town nevertheless push ahead on its appeal, it should be prepared to muster more than a single page—and perhaps even a case citation or two—in response to this issue.

### III.  Conclusion

For the foregoing reasons, Appellee's Motion is DENIED.  The Clerk of Court is respectfully directed to terminate the pending Motion, (Dkt. No. 12).

SO ORDERED.

Dated:   March 31, 2021
         White Plains, New York

_____

KENNETH M. KARAS
United States District Judge